UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

STATESVILLE DIVISION

| | |
|---|---|
| RANDY BLACK, on behalf of himself, and as Attorney-in-Fact for BRUCE KISER, on behalf of himself and all others similarly situated, <br><br>               Plaintiff <br><br> v. <br><br> CASE FARMS, LLC, <br><br>               Defendant. | CASE NO. 5:24-CV-35 <br><br><br><br> **AMENDED CLASS ACTION COMPLAINT** <br> **(JURY TRIAL DEMANDED)** |

COMES NOW, the Plaintiff, individually and as Attorney-in-Fact for Bruce Kiser, on behalf of himself and all others similarly situated, and files this Class Action Complaint against the Defendant Case Farms, LLC, for violation of the federal Packers and Stockyard Act of 1921, and the federal Declaratory Judgment Act, as well as the willful breach of contract, declaratory judgment, fraud, negligent misrepresentation, negligence, injunctive relief, and violation of Chapter 75 of the North Carolina General Statutes. Plaintiff seeks compensatory damages, treble damages or punitive damages, interest, attorneys' fees, costs, and injunctive relief prohibiting Defendant's continuing wrongful conduct.

## PARTIES

1.　　　Plaintiff, RANDY BLACK, is an individual and citizen and resident of Lincoln County, North Carolina.

2.　　　Defendant, CASE FARMS, LLC, is a North Carolina limited liability company, with its principal place of business in Troutman, Iredell County, North Carolina.

## JURISDICTION AND VENUE

3.　　　Plaintiff's federal claims arise under the Packers and Stockyards Act, 7 U.S.C. § 181, et seq. and federal Declaratory Judgment Act, 28 U.S.C. § 2201 and 2002.[1] Accordingly, this Court has

---

[1] Plaintiff acknowledges that the federal Declaratory Judgment Act is not an independent source of federal jurisdiction.

jurisdiction pursuant to 28 U.S.C. § 1331, and 7 U.S.C. § 209.

4.     This Court has supplemental jurisdiction over pendant claims arising under North Carolina law pursuant to 28 U.S.C. § 1367.

5.     This District is proper venue under 28 U.S.C. § 1391 because all of the parties are residents and domiciled in this District and the events in this lawsuit, concerning Defendant Case Farms, LLC's ongoing unlawful, deceptive and unfair conduct, occurred in this District as well.

## FACTUAL ALLEGATIONS

6.     Defendant Case Farms, LLC ("Case" or "Defendant Case") is a large poultry dealer, slaughtering and shipping for consumption millions of pounds of chicken each week.

7.     This is a class action brought on behalf of a proposed class of broiler chicken Growers, also known at poultry Growers (referred to herein as "Growers") against Case concerning its predatory, unfair and bad faith conduct in the broiler growing services market, also known as broiler grow-out services.

8.     Defendant Case operates as a vertically integrated poultry company, or what is known as an "Integrator." It controls each and every aspect of raising chickens (although they do not care for the birds themselves), slaughtering them, and selling their meat. Defendant Case's various chicken meat products come from broilers – genetically altered to produce so much breast meat that their bones often cannot properly support their body – that are born in Case's hatcheries, from eggs laid by Case's hens, and which remain Case's property throughout their entire lives. The broilers are grown on feed formulated and provided by Case, in conditions regulated by Case. Until new federal regulations were enacted this year, each bird was formerly allotted less than one square foot of space in the broiler houses. Additionally, the broilers are treated by veterinarians hired by Case, according to Case's standards and rules. They are slaughtered on the date Case selects, in  Case's plants, and where Case's employees evaluate the birds to determine whether they are fit for human consumption. If so, they are sold based on Case's pre-existing contracts with various purchasers.

9.     In this system, so-called farmers/independent contractors like the Plaintiff are known as

"Growers." The Growers are predominantly small, family-owned farms. They grow the broilers based upon contract terms dictated by Case. Growers, including Plaintiff, who cannot negotiate the terms of these contracts, are told they "must" sign these contracts on the spot, without consulting legal counsel, and are not given copies of such contracts at the time of signing nor until years later, if at all. Thus, these contracts are contracts of adhesion.

10.     Under these dictated contracts, the Growers bear virtually all the risk. They are responsible for building and maintaining the facilities on their farms in which the broilers are cared for, relying on Case's false representations regarding its commitment to its Growers and their future earnings. They are required by Case to take out massive loans, using documentation prepared by Case for the loan applications. Typically, these loans are guaranteed by the United States taxpayer, for which they are personally responsible. In return, the Growers, including the Plaintiff, are paid based on a "tournament system," in which all Growers whose chickens are slaughtered within a given time period compete with one another.

11.     Case disguises its virtual control of the outcome of the tournament through calculating the ranking of each grower to the ten-thousandth of a percent by averaging the so-called efficiency of a grower's production in the tournament instead of providing the Growers with the outcome of each house even though Case has this information available. The top-producing Growers – as solely determined by Case – are paid a premium over and above a so-called "base price," and the lower-ranked Growers are subjected to offsetting discounts or deductions below the "base price." This is "robbing Peter to pay Paul."

12.     This tournament system ensures that Case's costs are consistent, but the Growers can neither predict nor control their pay. Indeed, Case so dominates the Growers that the Growers are in effect "maintenance workers" or "sharecroppers" for Case. Growers, like Plaintiff, take out millions of dollars in loans to build their farms to Case's specifications, and then have no way to repay such loans other than to do exactly as Case says, without ever voicing objection, or risk financial ruin and bankruptcy, as happened to Plaintiff.

13.     Case controls all of the aspects of genetics, nutrition, health and virtually all aspects of the environment in the grow-out process. In all probability, the Growers may influence two percent (2%) of these aspects in the grow-out process. Case literally controls its broiler production process from the egg to the plate. Through the illegal contracts of adhesion that Case imposes on Growers, Case controls the following aspects of the grow-out process, all of which directly impact the weight of the chickens at the end of the grow-out process, and thereby the amount of remuneration the grower receives from Case:

     a.    Case unilaterally controls the drafting, language and terms of the poultry growing agreement.

     b.    Case controls the type and condition of the houses required on a grower's farm.

     c.    Case controls the contractors who are permitted to construct houses on a grower's farm.

     d.    Case controls the type and condition of the equipment required on a grower's farm.

     e.    Case controls whether or not upgrades (improvements) are required on a grower's farm.

     f.    Case controls the condition of the grower's farm adjacent to the poultry houses.

     g.    Case controls the required maintenance of the land around the poultry houses.

     h.    Case controls the type and kind of animals allowed on a grower's farm.

     i.    Case controls the type of pest control allowed on a grower's farm.

     j.    Case controls the genetics of the birds and the sex of the birds delivered to Growers' farms.

     k.    Case owns and/or controls the pullets that are used to produce laying hens.

     l.    Case owns the laying hens that produce the broiler eggs hatched by the laying hens.

     m.    Case owns the eggs that are hatched by the laying hens.

     n.    Case owns and controls the hatchery where the eggs are hatched.

     o.    Case owns the broiler chicks that are hatched.

     p.    Case controls the medication for the eggs and birds and the administration of the medication.

q.      Case controls the type of birds that each grower is given.

r.      Case controls the health and condition of the birds delivered to a grower.

s.      Case formulates and owns the feed provided to Growers and its nutritional value, and sometimes the feed is contaminated, and at other times Case runs out of feed.

t.      Case controls the additives included in the feed, including, without limitation, supplements.

u.      Case controls the type of feed delivered to a particular grower and timing of changes to the feed ration for that grower's chickens.

v.      Case controls if a grower gets reclaimed (old) feed.

w.      Case determines when the birds will be delivered to a grower.

x.      Case controls whether a grower receives veterinary services.

y.      Case controls when veterinary services are provided on the grower's farm.

z.      Case controls when and which birds must be killed (culled) by a grower.

aa.     Case controls the service technician that oversees each grower's farm.

bb.     Case controls the environment the birds are grown in.

cc.     Case controls the temperature of the poultry houses the birds are grown in.

dd.     Case controls the airflow of the poultry houses the birds are grown in.

ee.     Case controls the lighting of the poultry houses the birds are grown in.

ff.     Case controls when the birds will be picked up for processing.

gg.     Case controls the "catch crew" which picks up the birds for processing.

hh.     Case controls the transporting of the birds to the processing plant.

ii.     Case controls the weighing of the birds.

jj.     Case controls the amount of time between catching the birds and weighing the birds.

kk.     Case controls the amount of time between weighing the birds and processing the birds.

ll.     Case even controls the disposal of the excrement of its birds.

mm.     Case controls the condition and environment of the farm and poultry houses

before new flocks will be delivered to the grower's farm.

nn.     Case controls hose long Growers are held out between flocks.

oo.     Case controls how many flocks a grower receives.

pp.     Case controls the tournament system and income of the Growers.

qq.     Case controls recording of factors (weight, etc.) that determines a grower's income, without a grower having proper means of verifying the numbers alleged by Case.

rr.     Case controls whether a grower's flock is excluded from the tournament, thereby affecting all Growers' pay.

ss.     Case controls whether a grower's flock gets an exception, thereby affecting all Growers' pay.

tt.     Case controls which Growers are ranked against each other.

14.     Growers are responsible for investing the capital needed to build and maintain broiler houses, maintain ownership of the land upon which the broiler houses are located, provide the equipment, care for the broilers pursuant to Defendant's exclusive specifications, and pay for all labor needed to successfully care for the broilers until they reach slaughtering age (which is determined by the Defendant in its sole discretion).

15.     Growers use land they have purchased and developed for the purpose of caring for broilers to take in broilers owned by Defendant, and care for those broilers until Case decides to take them back, bearing all of the physical, environmental and health impacts from caring for the birds, even though the Growers never own the animals.[2] Case demands Growers be exclusive to them and not raise or care for poultry owned or obtained from any other source.

16.     Under this one-sided arrangement, the Growers are subject to the strict and unrelenting control of every detail by Case. The only thing a grower can truly call his/her own is the extensive debt that is accumulated as a direct result of meeting Case's strict demands.

---

[2] The Packers & Stockyards Act defines "poultry Growers" as persons engaged in the business of raising and caring for live poultry for slaughter by another, regardless of whether the poultry is owned by such person or by another but not an employee of the owner of such poultry. *See* 7 U.S.C. § 183(a)(8).

17.     As all local Growers working for Case are required to do, Bruce Kiser entered into an unconscionable adhesion grow-out contract with Case entitled, "Broiler Production Agreement."

18.     Once the Growers receive the chicks they care for the chicks for approximately sixty (60) days or 8.5 weeks depending on Case's required weight of the bird at the end of the grow-out process.

19.     Case is easily able to exert such control and enforce such unconscionable arrangements because it is virtually the only broiler Integrator to which the local Growers can turn. There is virtually no other viable option. The Broiler Production Agreement gave Case monopoly power over Plaintiff and all the other Growers by entangling them in Case's archaic, abusive and unconscionable payout system, better known throughout the industry as the "tournament system."

20.     This scheme benefits Case in many ways. Case is able to exercise all the control that an employer would exercise over an employee, but with none of the responsibility. Case does not have to pay the grower minimum wage or overtime nor is it subject to the North Carolina Wage and Hour Act; can literally require the grower to be on call twenty-four (24) hours a day, seven (7) days a week; is not responsible for workers' compensation or unemployment insurance; is not liable under Title VII or the North Carolina law for discrimination claims; and, can force the grower to bear all the costs of building and equipment maintenance and any upgrades its sees fit to require, as here, where Plaintiff was forced to take out burdensome loans just to pay for the privilege of caring for Case's chickens.

21.     The compensation for Growers such as Plaintiff is meted out according to the so-called "tournament system." Plaintiff was ranked against other Case Growers whose flocks were also processed in the same period, based upon the "Marketable Broiler Live Weight" (basically the weight of chickens when fully grown), divided by the "Weighted Average Formula Cost" (the cost of feed and medication Case had to supply to care for the chickens). Presumably, this tournament system should start with a level playing field for all the Growers, but such is not the case. The values upon which the tournament system is based are in no small part determined by the quality of chickens, feed and medicine provided by Case to the individual Growers.

22.     Case defrauded Plaintiff through the tournament system and subjected Plaintiff to unlawful practices by unilaterally imposing and utilizing a ranking system that can be, and in fact was, arbitrarily and capriciously manipulated. By ranking individual Growers, including Plaintiff, Case wrongfully pits each grower against the other, arbitrarily punishing what Case deems to be a less successful grower based upon criteria which are virtually under the total control of Case, and which are never revealed, explained or discussed with the Growers.

23.     The tournament system is designed to increase Case's profits at the expense of, and to the severe detriment of, its Growers, including Plaintiff, and thereby decreasing the profits of its Growers, including Plaintiff. Case defrauded Plaintiff by unilaterally imposing and utilizing the tournament system, which wrongfully placed Plaintiff in competition with their fellow Growers, all the while requiring Plaintiff to accept chicks that are genetically different, and chicks in varying degrees of health. Likewise, the feed supplied by Case is of dissimilar quantity, quality and consistency, and is often delivered inappropriately and in an untimely manner. Plaintiff was ranked against each of the other Growers even though they possessed dissimilar facilities, equipment and technology. Additionally, Plaintiff received differing degrees of technical assistance and was required to comply with management practices that were inconsistent with Plaintiff's fellow Growers.

24.     The end result of the tournament system is the imposition of an arbitrary and capricious ranking of each grower, which is designed to ensure Case's ability to wrongfully control its cost of operations at the expense of its Growers, including Plaintiff, and to maintain undue financial dominance over Plaintiff and their fellow Growers. Under this arbitrary and capricious system, a chicken grower can rank at the top of his/her group for one flock, and then just eight (8) weeks later, using the exact same animal husbandry practices, rank at the bottom of the group for the next flock. Case will tell a grower, including Plaintiff, to do things that benefit the Case "catch crew," which are certain things that are not in the contracts between Case and the Growers.

25.     Despite its arbitrary internal ranking system, Case receives the same sale price for its comparable products sold no matter the type of facilities and equipment that were located on the farm

where the chickens were cared for. Case's tournament system is the classic "rob Peter to pay Paul" scenario that is unfair, unjustly discriminatory and deceptive, as well as unduly and unreasonably prejudicial and disadvantageous to Plaintiff and fellow Growers.

26. Case has and continues to fraudulently conceal from said Growers, including Plaintiff, material facts regarding the detrimental effect to said Growers, including Plaintiff, resulting from the tournament system.

27. The key variables that determine Growers' scores, ranking, and ultimately, their compensation, are entirely under Case's control and therefore subject to manipulation without detection by the Growers, enabling Case to artificially depress a particular grower's payout, and which it did manipulate, in fact, to artificially depress Plaintiff's payouts.

28. The inequity of the tournament system was exposed in an online poultry publication article about a study done by the Poultry Science Association discussing the importance of certain determinative factors involved in the broiler grow-out process.

29. The Poultry Science Association ("PSA") was established in 1908. According to its webpage, https://www.poultryscience.org, the PSA is a professional organization consisting of approximately 1,800 educators, scientists, extension specialists, industry researchers, administrators, producers, and college students who are committed to advancing the poultry industry. Since 1908, PSA has maintained a level of prestige that ranks it among the top professional organizations in the field. For over a century, PSA's member scientists have contributed through their research to the progress of the poultry industry and the development of safer and more nutritious food products for the consumer. Throughout this period, PSA has served – and it continues to serve – as the premiere clearinghouse and publisher of basic and applied poultry research in the world. The application of research findings published in PSA's journals has been and remains a major contributor to the rapid growth and maturation of the meat and egg industries. In addition, poultry-related research has made substantial contributions to the overall understanding of human health and nutrition. Its webpage lists its objectives as follows:

   a. To stimulate the discovery, application and dissemination of knowledge.

b.      To create a forum for the exchange of information among various segments of the poultry industry.

c.      To publish original research, reviews and timely information in the official PSA publications: Poultry Science® and the Journal of Applied Poultry Research.

d.      To recognize outstanding professional achievement.

30.     In July of 2011, the PSA sponsored a symposium in St. Louis, Missouri addressing the future of the poultry industry, hot topics of current economics, and questions surrounding the future of food agriculture. Experts in poultry science examined the fields of genetics, nutrition, hatchery management, vaccination/immune modulation, coccidiosis control and antibiotic use. It was discussed and reiterated in an article written by Christine Alvarado, Ph.D., a professor at Texas A&M University and published by WATTAgNet.com, https://www.wattaggnet.com/articles/10194-genetics-plays-large-role-in-poultry-industry-s-future. Portions of Christine Alvarado's article stated as follows:

> "The reason the industry has been so successful is improvements in genetic potential of breeds to achieve efficient production standards with proper nutrition, environmental management and health. Based upon the overall conclusions of the symposium, genetics is critical to the successful future of the industry. According to Leeson, genetics account for 90% of the current and future status of the poultry industry, while the remaining criteria of nutrition (5%), environment (3%) and health (2%) are considered supporting roles."

31.     Although Case controls at least 98% of the grow-out process it ranks Growers as if they alone determine the outcome of the grow-out process, thereby shifting all of its economic risks in the grow-out process to the Growers, thereby using the tournament system (settlement) as an unfair, unjustly discriminatory and deceptive rigid cost-controlling device. This allows Case to pay its Growers in a manner that causes huge swings in the amount of compensation each grower receives in any given settlement. This is done even though there are countless variables controlled by Case that exist between the inputs into the grow-out process on each grower's farm.

32.     Not surprisingly, the federal government recently also determined that poultry farmers, like the Plaintiff, lack the independence needed to justify the award of small business loans. In the Executive Summary of a March 2018 report entitled, "Evaluation of SBA 7(A) Small Business Administration Loans to Poultry Farmers," the Inspector General of the Small Business Administration

(SBA OIG) summarized their findings:

> "We found that 7(a) loans made to Growers did not meet regulatory and SBA requirements for eligibility. The large chicken companies (Integrators) in our sample exercised such comprehensive control over the Growers that the SBA Office of the Inspector General believes the concerns appear affiliative under SBA regulations. Specifically, in our review of a sample of 11 7(a) loans made to Growers, as well as a review of defaulted 7(a) loans to Growers, we found Integrator control exercised through a series of contractual restrictions, management agreement, oversight inspections, and market controls. This control overcame practically all of a grower's ability to operate their business independent of Integrator mandates.
>
> This control was enforced through close Integrator oversight, management agreements, and grower-Integrator communication. A grower's failure to comply with these requirements could result in a significant decrease in Integrator payments, a reduction in flock placements, or a cancellation of the contract. A grower's economic viability was based upon a performing production contract with an Integrator and is the true basis for grower income and facility value."

The report goes on to state "entities are affiliates of each other when one controls or has the power to control the other. It does not matter whether control is exercised, so long as the power to control exists." The SBA OIG went on to state that their "observation of such control was further supported by research, studies, and reports from governmental, academic, and trade publications, as well as interviews with various lenders, Growers, and staff of Federal agencies and academic institutions."

33.     An Oklahoma State University budget for Growers published in 2006 showed a loss of $4,260 annually on a $255,000 investment, while the Alabama Farm Business Analysis Association showed negative annual returns in 10 of the 15 years between 1999 and 2009, with average aggregate losses over that time period of $182,000. Some commentators have criticized the latter study as under-reflective of losses as it reflects payouts 10% above actual average payouts.

34.     Plaintiff and Class Members earn disproportionately low incomes when compared to their large debt burdens and workload, reporting net incomes between $20,000 and $50,000 a year despite generally working 12-16 hours a day, seven days a week, fifty-two weeks a year. Meanwhile Case rakes in millions of dollars a year.

35.     Bruce Kiser ("Mr. Kiser") inherited his family land in Gaston County. Mr. Kiser does not have any children. In 2018, Mr. Kiser had preliminary conversations with managers for Case (the "Case Managers") to build chicken houses on his family land. One of such Case Managers was Greg Griffith.

36.     In these preliminary discussions with Case Managers, including Greg Griffith, the Case Managers went to Mr. Kiser's home and provided him with detailed financial projections, which Mr. Kiser then provided to his banking institution to obtain loans to initially build and equip Case chicken farms, with such loans being secured by his family land that he inherited. Experience has shown that the detailed financial projections provided by the Case Managers to Mr. Kiser were wildly incorrect. Upon information and belief, Case Managers similarly sat in the homes of all Growers in North Carolina, like Mr. Kiser, and told them to rely upon the same false financial statements. Based upon the material misrepresentations and material omissions by Case, Mr. Kiser borrowed approximately $937,000.00 from Carolina Farm Credit, secured by his family land, to build four (4) grower houses on Mr. Kiser's family land.

37.     The Case Managers, including Greg Griffith, have at all times known that these financial projection sheets are relied upon by Growers, like Mr. Kiser, and his banks, in deciding whether to enter into contracts with Case. Case has known at all times that its financial projections provided to Growers, like Mr. Kiser, are wildly incorrect, and yet does nothing to correct such financial statements, nor advise or inform Growers of their falsity. The Case Managers have known this at all times and deliberately misrepresented the opportunity for financial profit to Growers like Mr. Kiser, as well as to banking institutions, all of whom rely upon Case to their detriment.

38.     Mr. Kiser signed his first operative contract with Case in 2019.

39.     The Case Managers, including Greg Griffith, told Mr. Kiser he had to sign his contracts without modification, was not allowed to consult with an attorney before signing, and was not provided with a copy of the contract at the time Mr. Kiser signed them. Upon information and belief, Case followed the same protocols for all farmers in North Carolina signing Broiler Production Agreements with Case, including such statements that they had to sign without modification, nor provided copies, nor permitted to consult with an attorney.

40.     These same Case Managers also instructed Mr. Kiser that he was only permitted to use specific contractors to build the chicken houses on his family land.

41.     These same Case Managers told Mr. Kiser in 2018 that he could continue farming

chickens for Case until Mr. Kiser wanted to retire; that Case had contract farmers with them more than thirty (30) years.

42.    Upon information and belief, these same Case Managers made the same or similar knowingly false statements about the term and length of the Broiler Production Agreements to all Growers in North Carolina in order to induce them to sign said Broiler Production Agreements.

43.    Mr. Kiser received four (4) or five (5) flocks of chickens from Case in 2020 and 2021 after Mr. Kiser's chicken houses were completed. The first two (2) flocks were good and successful flocks, but the subsequent flocks had poor-quality birds and were unprofitable.

44.    Shortly thereafter, Mr. Kiser suffered a mental breakdown, requiring inpatient commitment and treatment at a medical facility. Plaintiff and his wife assisted Mr. Kiser with the work that was required at Mr. Kiser's farm after he got sick, and ultimately, Mr. Kiser asked his good friend, Plaintiff, if he would take over Mr. Kiser's obligations in the Broiler Production Agreement. Additionally, the Case Managers also encouraged and induced Plaintiff to take over Mr. Kiser's chicken houses, and in doing so, the Case Managers made the same misrepresentations and false promises that they had previously made to Mr. Kiser. Plaintiff has solely been responsible for all operations of Mr. Kiser's farm and grower houses since that time, including dealing with the Case Managers. All proceeds of Mr. Kiser's farm operations are given over by Mr. Kiser to Plaintiff, less the mortgage payment, but Plaintiff is responsible for maintaining Mr. Kiser's property and houses, as well as paying or incurring debts associated therewith. Mr. Kiser has had no direct contact or communication with Case or any Case Manager in years other than to receive threatening calls informing him Case would not deliver another flock of birds to his farm unless he controlled or corrected Plaintiff in some respect or another. Plaintiff's wife is listed as the Farm Manager with Case. Case has in all respects approved, ratified, endorsed, condoned and agreed to the de facto assignment of the contract from Mr. Kiser to Plaintiff.

45.    Each year since 2019, despite the fact that Plaintiff is solely operating Mr. Kiser's farm since Mr. Kiser's mental episode, and despite knowing full well of Mr. Kiser's mental health history, Case requires Mr. Kiser, rather than Plaintiff, to sign Case contracts each year. Attached hereto as Exhibit A is

the Contract executed by Mr. Kiser on October 4, 2021, well after Plaintiff had assumed the operations and obligations of the farm. This is because Mr. Kiser is financially bound to, and owned by, Case as a result of Mr. Kiser's large outstanding loan and debt on his family land, which Plaintiff is not burdened with or obligated to pay.

46.     Despite his mental health history, the Case Managers have told Mr. Kiser that he needs to sign his contracts "right now," that each is "identical to the prior one," and that "it does not matter what is in it," that he just needs to sign it, or he would "not get any more chickens" and his loan will be called due by the bank. Mr. Kiser was not given any time to read it before signing, much less any opportunity to consult with legal counsel. Upon information and belief, this same protocol was followed by all Case Managers in getting Case Growers in North Carolina to sign the Case contracts. Plaintiff is aware of at least one other grower, who wishes to remain anonymous due to threats of retaliation and fears of retribution, who does not have a signed contract because he demanded to allow an attorney to review it and Case refused. Case has continued to deliver this grower chickens despite the lack of a contract.

47.     Once a flock was delivered to Mr. Kiser's property, Plaintiff would then care for the flock according to strict and meticulous guidelines imposed by Case. When the flock matured, normally a 61-day process, Case would transport the flock to Case's processing facility.

48.     The misrepresentations by the Case Managers, including Greg Griffith, to Mr. Kiser that he would continue to receive chickens was the primary inducement for Mr. Kiser to enter into his initial contract with Case, as well as repeating such false statements in later years to Plaintiff in order to convince Plaintiff to expend funds to improve Mr. Kiser's chicken houses. A well-constructed poultry house has an average life span of approximately thirty (30) years. With proper maintenance and improvements, however, a well-constructed poultry house life span can increase to forty-five (45) to fifty (50) years. The Case Managers know that Growers, like Mr. Kiser, need at least fifteen (15) years, if not more depending on performance, just to pay off the initial indebtedness.

49.     The Case Managers knew that their representations to Mr. Kiser that Mr. Kiser would continue to receive chickens as long as he grew "good birds" were false and misleading and were intended

to induce Mr. Kiser to build his chicken houses in 2018 and 2019, at Mr. Kiser's expense, as a precondition to Case's continuing to contract with Mr. Kiser.

50. Case designates one of its employees to oversee the operations of a particular grower, such as Plaintiff. The Case Managers specifically assigned its most junior and inexperienced service men to work with its best Growers. Case, viewing Plaintiff as one of its best Growers, which was proven by the numbers, therefore sent Plaintiff service techs who had little experience working with chickens. Such are the "resources" made available to Plaintiff for advice and guidance.

51. Case and its service techs and management exercised control over every aspect of Plaintiff's grow-out operation as described in the paragraphs above.

52. The Case Managers knowingly made, and continue to make, materially false representations, both written and oral, about future income, costs, expenses, company policies and working relationships to Mr. Kiser and Plaintiff, or concealed related material facts and information, including, but not limited to, the "tournament system" and the inequities related thereto to accomplish this inducement, knowing that Mr. Kiser and Plaintiff were ignorant as to the falsity of these representations and that they would accept them as the truth and rely thereon to their own consequence and proximate injury. Mr. Kiser and Growers like him were required to financially encumber real and personal property and to convert their real property to a sole use, thereby functionally depreciating said property and devaluing said property and rendering Mr. Kiser and the Plaintiff as mere tenants, totally at the mercy of Case.

53. During the course of their relationship prior thereto, and continuing to the present, the Case Managers materially misled Mr. Kiser and the Plaintiff as to the financial prospects of growing poultry for Case. The Case Managers were and are aware that said

profit projections were false and misleading when made, were made with malice, and in bad faith in making said material misrepresentations.

54. The Case Managers have at various times altered the nutrition in the feed given to the chickens without telling the Growers, including Plaintiff. These changes in nutrition have effects upon the chickens, causing conditions such as overheating, and increased mortality. Such mortality increases

decrease Plaintiff's profits, entirely beyond the Plaintiff's control. Case knows this and uses such nutrition changes as a way to exert control over Plaintiff and intentionally manipulate Plaintiff's profits.

55.     Plaintiff has personally witnessed Case employees deliver far less feed than Plaintiff is charged for and pays for in his bin. Plaintiff has personally witnessed Case employees pick up contaminated feed from the ground and floor of the bin to be taken back and re-used for other chickens. The anonymous grower referred to hereinabove informed Case he was going to install scales on his farm so he could measure the amount of feed being delivered by Case. Case told the grower not only was he not allowed to do so but that if he did, he would not receive another delivery of chicks.

56.     Plaintiff has experienced increasing problems in the control asserted by Case and suffers retaliation by Case when Plaintiff complains about such problems. Plaintiff complained to Case about these and other problems, but nothing was or has been done by Case and the retaliation by Case against Plaintiff continues to get worse. Every single time Plaintiff complains about something to Case, the next flock's per-bird weight is always lower than his average and previous flocks and contrary to Plaintiff's own sampling of birds. When questioned about this fact, the Case Managers stated that it "is possible that some trip tickets get messed up" or put in the wrong farmer's account.

57.     Plaintiff has complained about the continually eroding condition of the birds that come from Case's hatchery. The Case Managers admitted to Plaintiff that the hatchery did not have a humidifier in the summer of 2023, and that Case took no action to correct it.

58.     Plaintiff has called other Growers for Case and all of such Case Growers agree they have been, and still are, experiencing similar conditions, or worse, but do not complaint to Case or else "Case will make an example of you and ruin you." The anonymous grower referred to hereinabove is just one example.

59.     During the course of their relationship, Case knowingly and willfully furnished to Plaintiff substandard food for the trucks that resulted in a financial loss to the Plaintiff and other Case Growers. Case delivered to Plaintiff lots of feed containing mold, to such an extent that they clogged the feeder augers. It is widely known among chicken farmers, like Plaintiff, and known by Case, that such mold

in the feed causes the immune systems of the birds to be weakened and allows disease to the birds to occur. Said actions were done knowingly and willfully and constitute bad faith on the part of Case and in retaliation for Plaintiff's continuing complaints to Case, and even just questions to Case, about animal cruelty and Case's breach(es) of contract.

60.     During the course of their relationship, Case knowingly and willfully failed to provide needed medication for the chicks that resulted in a financial loss to the Plaintiff. Said actions were done knowingly and willfully and constitute bad faith on the part of Case.

61.     Case deliberately and in bad faith took, and continues to take, certain actions that resulted in the inaccurate and deceptive weighing of chickens that resulted in financial loss to the Plaintiff. These actions include, but are not limited to, giving Plaintiff fewer chickens, in such poor conditions that the chickens could not survive, including piles and piles of dead chickens, delivered off the Case truck. Plaintiff's mortality rate of chickens always skyrockets after Plaintiff complains about an issue to Case.

62.     Despite Case's intentional and grossly negligent actions in regard to the chickens it provides to the Plaintiff, the Plaintiff has persevered, and throughout his commitment, work ethic, knowledge and actions, Plaintiff has consistently been a top ten grower out of all 147 Growers in North Carolina. Plaintiff has been No. 1 or No. 2 in the last few flocks and in the Top 4 for the past two or three years. Case continues to sabotage Plaintiff, however, by giving Plaintiff poor-quality birds, poor-quality feed, moldy feed that damages Plaintiff's equipment, no medication, no technical assistance or support, and no veterinarian services. Despite the Plaintiff's complaints to Case, Plaintiff has never been contacted by or allowed to speak to a Case supervisor one single time, despite repeated requests. Plaintiff has, however, been summoned to meetings at Case offices with Greg Griffith during which Griffith scolded Plaintiff for various alleged misconduct and threatened to never deliver any more birds to Kiser's farm.

63.     Plaintiff has continually observed and complained to Case about the chickens being delivered by Case with "femur head," which is a dead end of the femur, other chickens being delivered by Case with "slipped ligament" syndrome and chickens suffering yolk infection. Each of these issues are genetic deficiencies beyond Plaintiff's control in any way or manner. These same issues continued as the

chickens grew. Plaintiff has complained about the conduct of catch crews.

64. Plaintiff has complained to the Case Managers and Case technicians, including Ken Whiteside, that due to the amount of stress on such young chickens that the young chickens will contract dermatitis, which leads to, among other things, low feed conversion, lost pay, etc., and that Case had set Plaintiff up to fail. Plaintiff was right.

65. Plaintiff was charged for Penicillin by Case, which had to be administered to Case's birds directly as a result of Case's actions in affecting the quality and health of the chickens and not at all through the fault of the Plaintiff.

66. Plaintiff has spoken with other area chicken farmers who report that it is widely known in the community that the Case Managers are angry about Plaintiff complaining to Case about Case's actions or inactions, including, without limitation, Plaintiff's complaints to Case about Case's breaches of contract and animal welfare issues.

67. The Case Managers, on many occasions, have threatened Plaintiff and Mr. Kiser that Case will cancel the contract with Mr. Kiser, such threat happening virtually every time Plaintiff complains about Case's breach of the contracts with Kiser.

68. Plaintiff has had to pay, from his personal funds, to repair deep ruts caused by Case truck and delivery drivers despite Plaintiff's instructions to such Case drivers of where said Case drivers should and should not drive. Plaintiff has had to pay, from his personal funds, to place rock to prevent the catch crews from hitting and damaging his houses and property and equipment.

69. On July 21, 2020, the United States Food and Drug Administration issued a Notice of Violation, finding that Case has been in violation of the Packers and Stockyards Act continuously since July 2015, when Case was informed that its contracts failed to comply with the Packers and Stockyards Act.

70. On May 23, 2023, the non-profit organization Legal Impact for Chickens ("LIC Org") filed a lawsuit in Burke County, North Carolina, whereby LIC Org accused Case of intentional reckless acts of extreme neglect and violence against Case's own chickens, following an undercover investigation.

LIC Org also contends in the lawsuit that Case does not meet the National Chicken Council guidelines or industry standards with regard to Case's treatment of chickens. The case was dismissed but is now on appeal.

71.     The National Family Farm Coalition has noted that "[r]aising and processing poultry is based on a complex contract grower system, where the balance of power is markedly tipped in favor of poultry corporations over the Growers who actually raise the birds. Contract Growers do not own the birds, feed or medicine used in production, and pay is determined through a complicated "tournament system" pitting Growers against others in their region. Poultry companies have long been criticized for using deceptive practices that undermine fair competition and transfer business risks onto the grower." NFFC Weighs In, December 20, 2023.

72.     In response to years of Growers complaining about deceptive practices of the poultry companies, the federal government finally stepped in to take some measures. Effective February 12, 2024, new regulations took effect regarding the conduct of poultry companies like Case. The first in a series of new rules under the Packers and Stockyards Act is entitled "Transparency in Poultry Grower Contracting and Tournaments". This new rule:

     a.    Requires poultry dealers such as Case to provide clear, transparent information about the terms of their contracts with Growers, called the Live Poultry Dealer Disclosure Document, including the full range of potential earnings Growers can expect to make, potential variable costs that could be incurred, and how situations like sick flocks (disease), good shortages, farmer complaints and natural disasters will be handled, to ensure Growers have the key information they need to make important financial decisions, such as taking out a loan or capital intensive facility improvements;

     b.    Requires poultry companies such as Case to disclose the quality of the inputs (such as feed) they provide both upon delivery and upon payment. Since contract Growers do not own the poultry, the feed or the medicine, this information provides crucial transparency for calculating payments;

     c.    Requires poultry companies such as Case to disclose the quality of inputs provided to other Growers in their tournament group, and how their tournament formulas account for quality variability; and

     d.    Requires poultry company CEOs to sign agreements requiring company compliance with disclosures;

e.　　　Requires poultry companies such as Case to disclose to farmers the earnings of their contracted Growers; and

　　　　f.　　　Requires poultry companies such as Case to guarantee a minimum number of flock placements with the farmer per year and to specify the sizes of those flocks.

　　73.　　More than sixty (60) organizations signed a letter to President Biden urging the quick implementation of the Packers and Stockyards Act rulemakings. The USDA is expected to release two additional rules in the Act which will address deceptive and discriminatory practices, and market competition and fairness. U.S. Secretary of Agriculture Tom Vilsack stated in announcing the new rules "[I]t's fair to say that, for many, many years, we've heard concerns from poultry Growers as to whether or not the contracting and tournament system that they're engaged in provides a level of fairness and transparency." USDA senior advisor for fair and competitive markets Andy Green stated [I]t's high time that poultry Growers get the benefit of robust transparency – upfront and ongoing – to clean up the broiler chicken market of deceptive practices."

　　74.　　Numerous organizations applauded the new rule. The National Sustainable Agriculture Coalition said "[T[his final rule is an important first step that will shed light on the opaque and unfair poultry tournament system to protect contract poultry Growers. Transparency is necessary in any supply chain as a bulwark against anticompetitive or harmful manipulation of workers – in this case, Growers."

　　75.　　This new rule, however, will not solve all of the ills and deceptive misconduct of poultry companies like Case. The Campaign for Contract Agriculture Reform (CCAR) policy director Steve Etka stated "[T]he opaqueness of the contract poultry production system is at the heart of the economic abuse and deception inherent in the model. By requiring poultry companies to be more honest and business-like with prospective and existing poultry Growers, this rule helps to deter that deception and give farmers the information they need to make wise investment decisions. Without a doubt, a full-scale reform of the poultry payment system is needed, but this rule is a very important and welcomed step toward that goal." Farm Action President Angela Huffman said "[T]oday's actions are steps in the right direction, but on the whole, the USDA has not yet made it over the finish line on behalf of America's farmers and ranchers.

With time running out to complete the USDA's competition directives, the department must act much more aggressively to rein in monopoly power in the food system. The Final Rule on Transparency in Poultry Grower Contracting and Tournaments exemplifies this point. Providing contract Growers with additional information about flock sizes and how much they can expect to make is helpful. However, the tournament system is still exploitative, merely offering the farmers a take it or leave it deal. This rule simply shows farmers the terms of their exploitation. The USDA should follow the Justice Department's lead and ban the tournament system outright."

76.     Furthermore, this rule, while a step in the right direction, does nothing to compensate Growers for, or redress, past and continuing unlawful and deceptive conduct on the part of Case.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action on behalf of a class, and subclass, defined as follows: (1) all Case Growers who have signed BPA contracts with Defendant Case since January 2018, including the Case contract signed by Mr. Kiser.

78.     **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The Class members are so numerous that joinder of all is impractical. Upon information and belief, Defendant Case has forced hundreds of Growers to sign illegal contracts since 2018 and terminated many, all of whose names and addresses are identifiable through documents maintained by Defendant Case.

79.     **Existence and Predominance of Common Questions of Law and Fact** (Fed. R. Civ. P. 23(a)(2)): Common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members. The common legal and factual questions include:

a.     Whether Defendant Case knowingly implemented a contract that Defendant Case knew violated the Packers and Stockyards Act under coercive means.

b.     Whether Defendant Case knowingly made false statements, including false financial projections, and false statements regarding term of contracts, in order to induce class member Mr. Kiser to sign.

c. Whether Defendant Case violated the Packers and Stockyards Act and the North Carolina Unfair and Deceptive Trade Practices Act.

d. Whether Defendant Case exercised such complete domination and control of the "tournament" system whereby the same plaintiff class member exercising the same husbandry practices could have his or her "performance" and income fluctuate wildly.

e. Whether Defendant Case engaged in a willful pattern of retaliation terminating the contracts of those plaintiff class Growers who complained of wrongful treatment.

80. **Typicality** (Fed R. Civ. P. 23(a)(3)): Plaintiff's claims are typical of the claims of each Class member. Plaintiff has the same claims for equitable relief and damages that Plaintiff seeks for absent Class members.

81. **Adequacy** (Fed. R. Civ. P. 23(a)(4)): Plaintiff is an adequate representative of the Class. Plaintiff's interests are aligned with, and not antagonistic to, the interest of the members of the Class that Plaintiff seeks to represent, and Plaintiff has retained counsel competent in complex litigation and Plaintiff intends to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class.

82. **Predominance and Superiority** (Fed. R. Civ. Pro. 23(b)(3)): Questions of law and fact common to the Class members predominate over questions affecting only individual members and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The equitable relief and liquidated damages sought by each Class member are the same. Each Class member's damages, however, may be limited, such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, it would be an unnecessary burden on the courts to require Class members to file hundreds of individual lawsuits. Furthermore, individualized litigation presents the potential for inconsistent and contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant Case's conduct. By contrast, the class action device will result in substantial

benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF PACKERS AND STOCKYARDS ACT

83.     Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraph 1 through 82 of the Complaint, as if fully set forth herein.

84.     Defendant Case used its power over the Plaintiff and decided to retaliate against Plaintiff because of repeated complaints to Case about supplying dead birds, supplying sick birds, supplying moldy feed, suppling insufficient feed, Case leaving feed bins open causing vermin and mold, Case giving Plaintiff thousands of additional unscheduled chickens throwing off Plaintiff's weight and profit. Plaintiff's performance as a grower for Case has been consistently above average. Thus, neither his performance nor the operation of Plaintiff's farms could have been grounds for Case's unlawful treatment of the Plaintiff.

85.     The conduct described above constitutes unjustly discriminatory and deceptive practices by Defendant Case and its agents and employees, all in violation of the Packers and Stockyards Act, 7 U.S.C. § 192(a).

86.     The conduct described above resulted in Plaintiff and his fellow Class members being subjected to undue and unreasonable prejudice, and disadvantage; all in violation of the Packers and Stockyards Act, 7 U.S.C. § 192(b).

87.     Defendant Case's breaches of its poultry-growing arrangement with Mr. Kiser was without economic justification and thus, were in violation of the Packers and Stockyards Act, 7 U.S.C. § 192(b).

88.     Defendant Case's unconscionable contract with Mr. Kiser and the Class violated the Packers and Stockyards Act, 7 U.S.C. § 192(c).

89.     As a direct and proximate result of Defendant Case's violations, Plaintiff suffered and

incurred substantial damages. These damages include lost business opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT II
## FRAUD

90.     Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraph 1 through 89 of the Complaint, as if fully set forth herein.

91.     Defendant Case, by and through its Case Managers, including Greg Chapman, provided Mr. Kiser, Plaintiff, and other members of the Class with knowingly false financial statements, and false statements about the term or length of the contracts, which Defendant Case knew were false, and were presented to new Growers sitting in their homes that the Growers "would always grow for Case, because they [Case] would also be there to help them."

92.     Defendant Case, through the Case Managers, repeatedly told Mr. Kiser and Plaintiff that as long as Mr. Kiser and/or Plaintiff grew good birds, that Mr. Kiser would continue to receive placements of baby chicks from Case.

93.     The Case Managers' representations that Mr. Kiser and Plaintiff would continue to receive chickens was the primary inducement for Mr. Kiser to enter into the agreements with Case, as well as expand funds to improve Mr. Kiser's chicken houses. A well- constructed poultry facility has a life span of approximately thirty (30) years, and Mr. Kiser needed at least fifteen (15) years just to pay off the indebtedness.

94.     The Case Managers knew that their representations to Mr. Kiser, that the financial projections provided were false, and that Mr. Kiser would continue to receive chickens as long as Mr. Kiser grew birds were false, and were intended to induce Mr. Kiser, Plaintiff and the Class members to improve their facilities at their own expense, and to continue to contract with Defendant Case.

95.     Mr. Kiser reasonably relied on the false statements of the Case Managers, including Greg Chapman, and neither Mr. Kiser nor Plaintiff knew that the representations were false until

receiving poor quality chicks and suffering retaliation as a result of the complaints by Plaintiff to the Case Managers.

96. Mr. Kiser reasonably relied on the Case Managers' misrepresentations concerning the longevity of the relationship, and accuracy of financial projections showing that Mr. Kiser and Plaintiff could, in fact, make profits in Case's "tournament system," and the promises from Case personnel that Case would be placing chicks on Mr. Kiser's farm, to Mr. Kiser's detriment and did not know that the representations were false until Case failed to provide quality chicks without genetic deformities, feed, medication, support, and veterinarian services.

97. As a direct and proximate result of Defendant Case's intentional and willful fraud, Mr. Kiser and Plaintiff have suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT III
## BREACH OF CONTRACT

98. Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraph 1 through 97 of the Complaint, as if fully set forth herein.

99. Defendant Case deliberately and maliciously refused to honor the requirements of Mr. Kiser's contract to place quality non-deformed birds with acceptable mortality rates, quality feed, technical support, medication and veterinarian services on Mr. Kiser's farm. Defendant Case breached its contract with Mr. Kiser by deliberately dumping dead birds upon delivery, by delivering more birds than scheduled in order to throw off his weight/payments, and various other wrongful conduct identified above.

100. As a direct and proximate result of Defendant Case's violations, Mr. Kiser and Plaintiff have suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be

determined by a jury and the Court.

**COUNT IV**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

101.    Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraph 1 through 100 of the Complaint, as if fully set forth herein.

102.    Mr. Kiser's contracts with Defendant Case, as well as the long-standing relationship between Mr. Kiser and Defendant Case, contains an implied covenant of good faith and fair dealing that the parties would deal fairly and honestly with each other and would not do anything that would have the effect of destroying or injuring the right of the other party to receive fruits of their agreements.

103.    Defendant Case intentionally took actions to destroy Mr. Kiser's and Plaintiff's business. Defendant Case acted in bad faith by alleging baseless defaults, sabotaging his operations, refusing to deal fairly, retaliating against Plaintiff, and intentionally manipulating Plaintiff's ranking in the "tournament system.

104.    Defendant Case thereby breached its duty of good faith and fair dealing with Mr. Kiser and Plaintiff by, *inter alia*, taking actions to destroy Mr. Kiser's and Plaintiff's business. As a direct and proximate result of the intentional wrongful acts of Defendant Case and its agents, Mr. Kiser and Plaintiff suffered damages and, if evicted from the property, will suffer even more significant damages, including, but not limited to, imminent loss of its property, loss of profits, loss of goodwill, attorneys' fees, and other legal expenses.

105.    As a result of the actions of Defendant Case violating the implied covenant of good faith and fair dealing contained in the agreements as against Mr. Kiser and Plaintiff herein, Plaintiff is entitled to Mr. Kiser's and Plaintiff's damages incurred.

106.    The foregoing actions by Defendant Case were intentional, willful and wanton, and done toward Mr. Kiser and/or Plaintiff with sufficient fraud, malice, and oppressional to warrant the imposition of punitive damages against Defendant Case.

## COUNT V
## VIOLATION OF N.C.G.S. CHAPTER 75

107.    Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraph 1 through 106 of the Complaint, as if fully set forth herein.

108.    Defendant Case's actions in connection with this matter violate the federal Packers and Stockyards Act of 1921, 7 U.S.C. § 191, *et seq.*, each of which constitutes an unfair method of competition or an unfair or deceptive act or practice (the "Unfair Trade Practices") in violation of Chapter 75 of the North Carolina General Statutes.

109.    Defendant Case's actions as stated herein constitute Unfair Trade Practices, which include, but are not limited to:

       a.    Defendant Case misrepresented the opportunity for financial profits in inducing Mr. Kiser to enter into a grower contract relationship;

       b.    Defendant Case misrepresented its promise to continue to supply chicks and that Mr. Kiser could continue to raise birds for Case until he retired;

       c.    Defendant Case intentionally and in retaliation for Plaintiff's complaints of animal cruelty and mistreatment by Case, and Case's failure to perform under its contractual obligations, manipulated its "tournament system" by giving Plaintiff thousands of extra unscheduled birds that brought down the Mr. Kiser's weight and ranking in the "tournament system;"

       d.    Defendant Case misrepresented the legal terms of the contracts between Case and Mr. Kiser, depriving Mr. Kiser of the opportunity to read and review such contracts before signing, and the Case Managers telling Mr. Kiser that he "must sign right now," and not giving copies to Mr. Kiser at the time of signing said contracts;

       e.    Defendant Case's contracts violate the Packers and Stockyards Act, and are thus unfair trade practices, in that they do not provide Plaintiff with notice of alleged breach, right to cure (much less, even respond to) a notice of an alleged breach, and by manipulating Mr. Kiser's ranking in the "tournament system;"

f. By Defendant Case spreading false lies into the community in a deliberate (and successful) effort to destroy Plaintiff's reputation in the community in order to (successfully) destroy Plaintiff's ability to obtain mitigation chicken grower contracts with another poultry company;

g. By retaliating against Plaintiff for his complaints to Defendant Case about animal welfare and humane treatment of animals by deliberately giving Plaintiff substandard birds arriving dead at Mr. Kiser's farms, by manipulating contents of feed to cause damage to Plaintiff's flocks, by feed truck drivers delivering moldy feed, and other methods and tactics of retaliation;

h. Defendant Case otherwise engaged in unfair methods of competition or unfair or deceptive acts or practices in this matter;

i. Such acts are in and affecting commerce; and

j. Such acts are the direct and proximate cause of damages to the Plaintiff.

110. As Plaintiff's damages are a direct, foreseeable, and proximate result of Defendant Case's Unfair Trade Practices, Plaintiff is entitled to recover such damages, including treble damages/punitive damages and attorneys' fees as set forth in Chapter 75 of the North Carolina General Statutes, in an amount to be determined at trial.

## COUNT VI
## NEGLIGENCE

111. Plaintiff hereby alleges and incorporates by reference the allegations contained in Paragraph 1 through 110 of the Complaint, as if fully set forth herein.

112. Defendant had and has a duty to exercise reasonable or ordinary care in supplying Plaintiff and the Class with healthy chicks and to discover risks and take precautions to prevent the delivery of sick, unhealthy or injured chicks. Defendant breached the duties owed to Plaintiff and the Class.

113. Defendant, its employees, servants, contractors and/or agents were, in the delivery of its birds to Plaintiff and the Class, negligent, grossly negligent, careless, reckless, willful and wanton with a conscious disregard for the rights of Plaintiff and the Class in the following particulars:

a.   In failing to exercise the reasonable skill, care and prudence exercised by an ordinary, reasonable hatchery operator under the circumstances;

b.   In failing to exercise ordinary care to keep its chicks in a reasonably safe and healthy condition and prevent mortality;

c.   In failing to implement appropriate preventive measures, procedures or policies designed to eliminate, prevent and/or reduce mortality and dangerous conditions in the hatchery, including but not limited to operating without an operative fan or dehumidifier for several months and otherwise controlling the humidity of the hatchery;

d.   In failing to implement appropriate preventive measures, procedures or policies designed to prevent disease and death in the chicks including but not limited to appropriate vaccination programs and formulas;

e.   In failing to properly remedy the dangerous condition of the hatchery after it knew or should have known through reasonable diligence that a dangerous condition existed;

f.   In failing to properly train, instruct, supervise and discipline it employees and agents, including its catch crew, who routinely damage, injure, maim and kill hundreds of chicks, which Plaintiff and the Class must clean up and dispose of, and are deprived of the income from, by recklessly throwing them from the vehicle onto the ground with no care or regard for the chicks' health;

g.   In failing to provide medication to birds until a certain mortality level is reached even when such medication could save hundreds or thousands of birds, and income for Plaintiff and the Class, and results in animal cruelty since Case knows they are sick and allows them to suffer and/or die;

h.   In failing to adequately inspect and/or care for the chicks before delivery to Plaintiff and the Class and to cull to treat sick chicks rather than simply dumping

them all on Plaintiff and the Class and making them deal with the sick ones;

  i. In negligently maintaining and cleaning and disinfecting the hatchery;

  j. In causing and allowing the dangerous conditions and elevated count of unhealthy chicks to exist in its hatchery;

  k. In allowing the catch crews to destroy, injure, main and kill chicks during delivery;

  l. In failing to obey the laws, statutes, regulations and ordinances then and there prevailing;

  m. In other particulars as the evidence produced in discovery and at trial may show.

114. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer damages as the evidence produced in discovery and at trial may show. Plaintiff and the Class are therefore entitled to judgment against Defendant for actual and punitive damages.

## COUNTY VII
## DECLARATORY JUDGMENT

115. Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraph 1 through 114 of the Complaint, as if fully set forth herein.

116. Plaintiff seeks and is entitled to a declaration that Case's conduct is in violation of the federal Packers and Stockyard Act and regulations and enjoining Case from further conduct inconsistent with the Act and requiring compliance with the Act going forward.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court award the following relief:

1. To enter an Order certifying the proposed Class under Rule 23 and appointing Plaintiff and the undersigned counsel of record to represent the Class;

2. Judgment declaring that, pursuant to the contracts and federal law, Defendant Case's conduct with regard to Mr. Kiser and Plaintiff violated the Packers and Stockyard Act, and enjoining such misconduct and requiring compliance with the Act;

3. Preliminary and Permanent Injunction compelling Defendant Case's specific performance to continue supplying birds under the contract with Mr. Kiser, and barring Defendant Case from terminating any contracts with Mr. Kiser and/or Plaintiff during the pendency of this lawsuit;

4. An award of compensatory, incidental, consequential, treble and/or punitive damages in an amount to be determined at the trial of this matter, in favor of Plaintiff and against Defendant Case;

5. An award of pre- and post-judgment interest, attorneys' fees, expenses, costs, and disbursements pursuant to N.C. Gen. Stat. § 75-16, *et seq*., or other applicable law, against Defendant Case;

6. To permanently enjoin Case, pursuant to the Packers and Stockyards Act, from implementing or terminating any contracts that violate the Packers and Stockyards Act;

7. That all issues of fact be tried by a jury; and

8. That Plaintiff be granted all other relief, both legal and equitable, which the Court deems just and proper.

September 20, 2024

**OXENDINE BARNES & ASSOCIATES PLLC**

*s/ Ryan D. Oxendine*
Ryan D. Oxendine, N.C. State Bar No. 27595
James A. Barnes IV, N.C. State Bar No. 33356
6500 Creedmoor Rd., Suite 100
Raleigh, NC 27595
Telephone: (919) 848-4333
Facsimile: (919) 848-4707
Email: ryan@oxendinebarnes.com
Email: jim@oxendinebarnes.com

*s/ J. Clay Hopkins*
J. Clay Hopkins, S.C. State Bar No. 102053
*Admitted Pro Hac Vice*
HOPKINS LAW FIRM, LLC
171 Church St., Suite 160
Charleston, SC 29401
Telephone: (843) 314-4202
Facsimile: (843) 314-9365
Email: clay@hopkinsfirm.com

*Attorneys for Plaintiff*